Filed 1/9/23  WonderWorks PTE. v. Hewlett-Packard CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| WONDERWORKS PTE. LTD., <br><br> Plaintiff and Appellant, <br><br> v. <br><br><br> HEWLETT-PACKARD COMPANY et al., <br><br> Defendants and Respondents. | A165810 <br><br> (Santa Clara County Super. Ct. No. 114-CV-273632) <br><br><br> **ORDER MODIFYING OPINION; AND DENYING PETITION FOR REHEARING** <br> **[NO CHANGE IN JUDGMENT]** |

**THE COURT[1]:**

It is ordered that the opinion filed herein on December 16, 2022, be modified in the following particulars:

1.    On page 14, the following words are deleted from the sentence that begins on line 22 and ends on line 24: "but it consistently failed to do so."  The sentence now reads:

> "The order recounts that WonderWorks had the opportunity to file an offer of proof before the court ruled on every motion relating to the EULA."

---

[1]  Tucher, P.J., Fujisaki, J., and Rodríguez, J. participated in the decision.

2. On page 31, the following words are deleted from the sentence that begins on line 26 and ends on line 1 of page 32: "a copy of this document in the Appellant's Appendix or." The sentence now reads:

> "We do not find any basis in the appellate briefs for questioning the trial court ruling."

These modifications do not effect a change in the judgment.

Appellant's petition for rehearing is denied.

Dated:___1/9/23___      _____TUCHER, P.J._____ P.J.

*WonderWorks Pte. Ltd. v. Hewlett-Packard Company et al.* (A165810)

Filed 12/16/22 WonderWorks PTE. v. Hewlett-Packard CA1/3 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| WONDERWORKS PTE. LTD., Plaintiff and Appellant, v. HEWLETT-PACKARD COMPANY et al., Defendants and Respondents. | A165810 (Santa Clara County Super. Ct. No. 114-CV-273632) |

This appeal pertains to a dispute arising out of a failed project to develop a computer system for Bank Negara Malaysia, the central bank of Malaysia. Hewlett-Packard (M) Sdn. Bhd. (HP Malaysia) was the prime contractor for the project, and WonderWorks Pte. Ltd. (WonderWorks) was a subcontractor.[2] After Bank Negara and HP Malaysia agreed to terminate the project, WonderWorks filed this action alleging it was not compensated for its services and software, and that it lost millions of dollars due to tortious

---

[2] "Pte. Ltd." stands for private limited company, and Sendirian Berhad (Sdn. Bhd.) refers to a private limited company in Malaysia (M).

The California Supreme Court transferred this matter from the Court of Appeal for the Sixth Appellate District to the First Appellate District on August 9, 2022.

1

conduct by HP Malaysia and two of its affiliates, the Hewlett-Packard Company (HP Co.) and HP Enterprise Services, LLC (HP Enterprise).

Following a jury trial, judgment was entered against HP Malaysia but in favor of HP Co. and HP Enterprise. The judgment requires HP Malaysia to pay WonderWorks approximately $1.75 million for its unpaid work on the project.

On appeal, WonderWorks contends that its judgment against HP Malaysia is insufficient and must be reversed due to the erroneous exclusion of evidence and an improper jury instruction. It contends further that the judgment in favor of HP Co. must be reversed due to an erroneous summary adjudication order rejecting WonderWorks' theory that HP Malaysia was HP Co.'s agent. We reject these contentions and affirm the judgment.

## BACKGROUND

### I. The Complaint

WonderWorks filed this action in 2014. The 2018 second amended complaint (complaint) is the operative pleading with respect to issues raised on appeal. According to the complaint, WonderWorks is a small start-up software company, wholly owned by Sri Rajan. The complaint refers to the defendants collectively as HP and contains allegations that HP Malaysia and HP Enterprise are agents or alter-egos of HP Co., and that defendants conspired or aided and abetted each other. WonderWorks' claims are divided into fourteen causes of action based on theories of breach of contract, fraud, negligence, business interference, and quantum meruit. Every cause of action incorporates by reference a lengthy background section. To frame the issues on appeal, we summarize key events alleged by WonderWorks.

In April 2011, HP Malaysia and Bank Negara entered into a contract (the Prime Contract), pursuant to which HP Malaysia agreed to build and

2

maintain a computerized financial reporting system for Bank Negara (the project).

In July 2011, WonderWorks entered into a contract with HP to "provide certain software components and services" for the project (the Subcontract). This "single" "integrated" contract consisted of three types of form documents: a "Statement of Work"; a "Global Supply Chain" document containing standard terms and conditions; and purchase orders.

After WonderWorks began work on the project, HP began taking unlawful actions against WonderWorks, the complaint alleged. For example, they avoided paying WonderWorks "millions of dollars [in] license fees" by understating the number of "central processing units and cores" on which they installed WonderWorks software. They also failed to pay "millions of dollars" on invoices for work WonderWorks performed pursuant to purchase orders. Then they induced WonderWorks to keep working on the project by promising to pay or otherwise resolve the outstanding invoices and license fees.

Both before and after WonderWorks agreed to join the project, HP made false representations and concealed material facts as part of a scheme to acquire WonderWorks' software and services without having to pay for them, the complaint continued. For example, they promised to partner with WonderWorks on a "lucrative Cloud System that would be replicated worldwide," never intending to follow through. They also concealed a plan to build an alternative computer system without WonderWorks. And during construction of the computer system for Bank Negara, they concealed information about the number of times they installed WonderWorks' software in order to avoid incurring license fees.

3

The defendants were unable to fulfill their obligations under the Prime Contract due to their own failings, plaintiff alleged. So, defendants negotiated an "exit agreement" with Bank Negara and abandoned the project. Their failure to build the promised computer system "eliminat[ed] the utility and benefit of WonderWorks software" not just for Bank Negara but for "Reporting Entities," i.e., other financial institutions that would have used the computer system had the Prime Contract been completed.

## II. Summary Judgment/Adjudication

In May 2018, the trial court decided two motions for summary judgment or summary adjudication: a joint motion filed by HP Co. and HP Enterprise, referred to by the court as the "American Entities"; and a separate motion filed by HP Malaysia. In its 48-page order, the court granted the American Entities summary adjudication of many claims, granted HP Malaysia summary adjudication of substantially fewer claims, and made several findings that limited the scope of WonderWorks' case.

### A. Contract-Based Causes of Action

#### 1. Breach of the Subcontract

In its eighth and ninth causes of action, WonderWorks alleged that the defendants committed two distinct breaches of the Subcontract by: failing to pay for all the work that WonderWorks performed on the project; and installing WonderWorks' software on additional central processing units (CPUs) without paying for additional licenses to do so. The court granted the American Entities summary adjudication of these causes of action, but denied it to HP Malaysia. In reaching these rulings, the court made several findings pertinent to this appeal.

4

## a. The Contract

The court found that the Subcontract was a single integrated agreement between WonderWorks and HP Malaysia, comprised of a Statement of Work, the Global Supply Chain Standard Terms and Conditions, and purchase orders. The American Entities were not parties to the Subcontract.

The court based these findings on paragraph 25 of the complaint, which set forth material factual allegations regarding the existence of a contract, and on the summary judgment evidence produced by the American Entities, which showed that they were not parties to the three form documents that comprised the Subcontract. WonderWorks did not produce responsive evidence to raise a triable issue as to these facts.

In reaching these conclusions, the court observed that some terminology in the complaint obfuscates WonderWorks' factual allegations and legal theories, "perhaps intentionally." For example, plaintiff's use of the word "HP" to refer to all three defendants was "neither appropriate nor helpful." Moreover, in paragraphs expressly alleging a breach of the Subcontract, WonderWorks used the plural word "contracts." The court construed this term as a reference to the three form documents comprising the Subcontract, i.e., the Statement of Work, Global Supply Chain Standard Terms and Conditions, and purchase orders.

The complaint paragraphs alleging breach of contract (as distinguished from the background section) also refer to other documents, not previously mentioned in paragraph 25, which the court disregarded as "surplusage." The additional documents were "Change Requests, EULAs, and oral and email agreements." The court also observed that a EULA, which stands for End User License Agreement, "binds the end user or consumer of software; it

5

does not ordinarily bind a collaborating software developer." (Citing *SoftMan Products Co., LLC v. Adobe Systems, Inc.* (N.D.Cal. 2001) 171 F.Supp.2d 1075, 1087.)

Although WonderWorks opposed summary adjudication of these claims, it appeared to concede that the American Entities were not parties to the Subcontract. Instead, it argued these defendants could be liable for breach of contract as alter egos of HP Malaysia. The court rejected this argument based on the defense evidence, which showed that "HP Malaysia operated as a separate and independent entity from the American Entities such that it was not a mere shell or conduit for their affairs and vice versa." WonderWorks failed to respond with evidence that would create a triable issue as to a unity of interests that would destroy corporate separateness. (See *Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 811 [discussing unity of interest requirement for proving alter ego liability].)

Because the American Entities were not parties to the Subcontract or alter egos of HP Malaysia, the trial court granted them summary adjudication of all contract claims relating to the Subcontract.

### b. Choice of Law

Before deciding HP Malaysia's motion for summary adjudication, the court found that a Malaysian choice of law provision in the Subcontract was enforceable. Moreover, Malaysian law applied to both contract and tort claims alleged against HP Malaysia because they all arose out of the subcontract relationship.[3]

---

[3] "Determination of the law . . . of a foreign nation . . . is a question of law." (Evid. Code, § 310, subd. (b).) It is to be determined by the court pursuant to rules of evidence governing judicial notice. (*Ibid.*) If "the court resorts to the advice of persons learned in the subject matter," such advice may be received in open court or in writing. (Evid. Code, § 455, subd (b).)

6

HP Malaysia was denied summary adjudication of the two causes of action alleging breach of the Subcontract because it failed to carry its initial burden as the moving party of establishing the absence of a triable issue of fact under Malaysian law.

## 2. Quantum Meruit

In its fourteenth cause of action, Wonderworks alleged that between March 2011 and October 2012, defendants "demanded" that WonderWorks perform services for the benefit of defendants, WonderWorks performed the requested services "under coercion," and defendants did not pay for those services. WonderWorks sought compensation for "the fair and reasonable value" of services rendered.

The American Entities were granted summary adjudication based on evidence demonstrating that WonderWorks performed work at the request of and for the benefit of HP Malaysia, and that the American Entities are not alter egos of HP Malaysia. WonderWorks failed to raise a triable issue as to either fact. However, HP Malaysia was denied summary adjudication because it did not carry its initial burden of demonstrating that WonderWorks could not establish an essential element of its quantum meruit claim.

## 3. Other Contract-Based Causes of Action

All defendants were granted summary adjudication of a cause of action alleging breach of the implied covenant of good faith and fair dealing allegedly arising out of the Subcontract. The court also dismissed a cause of action alleging breach of unspecified third-party contracts, which was

---

The appellate record contains two declarations from defendants' Malaysian law expert that were submitted in support of the summary adjudication motions.

7

premised on allegations that HP Malaysia executed contracts with financial institutions that would have used Bank Negara's reporting system if it had been completed, and that WonderWorks was the intended beneficiary of those contracts. These rulings are not challenged on appeal.

## B. Tort Causes of Action

Applying Malaysian law to decide HP Malaysia's motion and California law to decide the American Entities' motion, the court denied summary adjudication as to all tort causes of action, save one.[4] Again, we highlight rulings relevant to the present appeal.

### 1. Fraud

The complaint's first four causes of action alleged fraud based on theories of intentional misrepresentation, fraudulent inducement, negligent misrepresentation, and fraudulent concealment. These theories were pleaded in the most general terms, and the court observed that it was difficult to determine whether factual allegations supported them because the complaint's long convoluted background section was incorporated wholesale into each cause of action. Ultimately, the court rejected a defense argument that fraud had not been pled with sufficient specificity and denied summary adjudication, as it was able to locate specific paragraphs in the complaint that alleged misrepresentations and concealed facts. However, the court also made a record of the fact that WonderWorks had previously been granted leave to amend in order to clarify its pleaded theories so as to avoid confusion

---

[4] The American Entities were granted summary adjudication of a cause of action alleging that they interfered with HP Malaysia's ability to perform contracts with reporting entities because WonderWorks alleged no facts to show it was a third-party beneficiary of purported contracts with reporting entities.

8

at summary judgment and trial, and that "inexplicably" WonderWorks' amended complaint did not clarify its fraud theories.

### 2. Negligence

In its twelfth cause of action, WonderWorks alleged the defendants were negligent because they failed to exercise reasonable care when performing obligations under the Prime Contract, and the breach of this duty caused WonderWorks to suffer damages. Although all defendants were denied summary adjudication of this cause of action, the court's findings further limited WonderWorks' case against the American Entities.

### a. Direct Liability Findings

The American Entities had no duty of care arising from the Prime Contract, the court found, because they were not parties to the agreement between HP Malaysia and Bank Negara. Therefore, the American Entities could not be directly liable for negligence under the theory alleged. However, HP Malaysia was a contracting party, and it did not carry its initial burden of demonstrating that WonderWorks' theory of negligence was untenable under Malaysian law.

### b. Vicarious Liability Findings

Because WonderWorks alleged that HP Malaysia and HP Enterprise were HP Co.'s agents, the court considered whether the American Entities could be liable for HP Malaysia's alleged negligence pursuant to an agency theory.

The court found that control is the key characteristic of an agency relationship and that a corporate parent's general executive control over a subsidiary is insufficient. (Citing *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 542 (*Sonora Diamond*).) Instead, " 'the parent must be shown to have moved beyond the establishment of general policy and

9

direction for the subsidiary and in effect taken over performance of the subsidiary's day-to-day operations in carrying out that policy.' " (Quoting *Sonora Diamond*, at p. 542, italics omitted.)

Applying these principles, the court found that WonderWorks' agency theory of liability was unmeritorious. The summary judgment evidence showed HP Malaysia was not controlled by the other defendants "to such a degree that it was merely their agent." WonderWorks failed to raise a triable issue as to this fact. Instead, it relied on evidence that the American Entities provided assistance in connection with the project when it appeared the project was in jeopardy, which did not "qualif[y] as usurpation of control over HP Malaysia's day-to-day operations as an entity."

However, there was a triable issue as to WonderWorks' aider and abettor theory of liability. Aider and abettor liability may be imposed on a defendant " 'who knows that another's conduct constitutes a breach of duty and substantially assists or encourages the breach.' " (*American Master Lease LLC, v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1476.) The American Entities produced evidence that they did not knowingly agree to engage in any tortious activity. But WonderWorks raised a triable issue as to the American Entities' knowledge by proffering evidence that these defendants were involved in material decisions impacting the trajectory of the project. On this basis, the American Entities were denied summary adjudication of the negligence cause of action.[5]

---

[5] The court found no triable issue as to WonderWorks' conspiracy allegations against the American Entities because a conspiracy can only be formed by parties who are already under a duty to the plaintiff. (Citing *Chavers v. Gatke Corp.* (2003) 107 Cal.App.4th 606, 614.)

10

### 3. Other Tort Causes of Action

In its fifth cause of action, WonderWorks alleged that the American Entity defendants intentionally interfered with the Subcontract by taking "control" of the contractual relationship between WonderWorks and HP Malaysia, and preventing WonderWorks from realizing profits under the Subcontract. The American Entities were denied summary adjudication of this claim because they failed to carry their initial burden of demonstrating that it lacked merit.

Finally, we note that WonderWorks also alleged causes of action for interference with economic advantage and commercial disparagement. Although summary adjudication of these claims was denied, WonderWorks abandoned them at trial, so they are not at issue on appeal.

## III. Jury Trial

Trial was held in September and October 2018. According to its trial brief, WonderWorks intended to pursue all claims for which summary adjudication had not been granted. In early October, the trial court granted WonderWorks' motion for leave to amend the quantum meruit claim alleged in the complaint, which sought compensation for unpaid services but not for unpaid goods. Over defendants' objection the court granted WonderWorks "leave to amend . . . to state a claim based on both the services and goods it provided for which it did not receive compensation."

By the close of evidence, WonderWorks' case was pared down to three claims against HP Malaysia and a single claim against the other defendants. On October 19, 2018, the jury returned special verdicts as to these claims.

### A. HP Malaysia

**Breach of the Subcontract**: The jury found that WonderWorks performed its contractual obligations, HP Malaysia did not perform its

11

contractual obligations, and there was no defense for HP Malaysia's breach. The "amount of reasonably certain damages that WonderWorks suffered as a direct result of HP Malaysia's breach of the contract" was $474,861.00.

**Quantum Meruit**: The jury found that HP Malaysia demanded services and/or goods from WonderWorks that WonderWorks was not contractually obligated to provide, and that WonderWorks provided those services and/or goods with the intention that it would be compensated. The jury also found that HP Malaysia did not pay WonderWorks the fair and reasonable value for services and goods provided, entitling WonderWorks to damages in the amount of $1,277,901.00. And, the jury found, WonderWorks was entitled to prejudgment interest on these damages in the amount of seven percent, compounded annually starting on August 27, 2012.

**Fraud**: The jury found that a false statement of fact had not been made by anyone with authority to act on behalf of HP Malaysia. Someone with such authority did conceal a material fact from WonderWorks, but WonderWorks did not "suffer a financial loss as a result of its reliance on the nonexistence of the fact concealed." Therefore, HP Malaysia was not liable for fraud.

### B. The American Entities

**Intentional Interference with the Subcontract**: The jury found that HP Co.'s conduct prevented WonderWorks' performance of the Subcontract or made performance of the contract more expensive or difficult. Further, HP Co. intended to disrupt performance of the Subcontract or knew that disruption was substantially certain to occur. However, HP Co. had "a legitimate financial interest in the contractual relationship between WonderWorks and HP Malaysia," and it acted "only to protect its own financial interest." Further, HP Co. used "appropriate means" to protect its

own financial interest. Therefore, HP Co. was not liable for intentional interference with the Subcontract.

HP Enterprise was also found not liable for intentional interference with the Subcontract, but because WonderWorks raises no issues on appeal relevant to HP Enterprise, we will mention this entity no further.

## IV. The Judgment

On April 29, 2019, the trial court entered a judgment, which incorporated the special verdict of the jury. HP Co. was granted judgment against WonderWorks, and WonderWorks was granted judgment against HP Malaysia in the total amount of $2,549,993. This award included seven percent compound interest on the quantum meruit award, and three percent interest on contract damages.

In May 2019, HP Malaysia moved for judgment notwithstanding the verdict with respect to the quantum meruit claim, arguing (1) the verdict was not supported by substantial evidence, and (2) WonderWorks was not entitled to compound interest. Only partially granting the motion, the court rejected HP Malaysia's sufficiency of the evidence challenge but reduced the judgment to award three percent simple interest on the quantum meruit claim.

## DISCUSSION

## I. The End User Licensing Agreement

### A. Issues Presented

WonderWorks' primary claim of error is that the trial court excluded "all evidence" of the End User Licensing Agreement (EULA) that WonderWorks uses to protect its intellectual property rights. WonderWorks argues this evidence was admissible to prove that HP Malaysia agreed to pay a license fee each time WonderWorks' software was installed on a "core" device during construction of the information system for the project.

13

We review the trial court's evidentiary rulings for abuse of discretion. (See *Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446–447.) Before turning to rulings regarding the EULA, we correct two factual misconceptions that permeate WonderWorks' appellate arguments.

First, "all evidence" of the EULA was not excluded at trial. Solely by way of example, we note that WonderWorks' owner, Sri Rajan, testified about the function and content of his company's EULA. During that testimony, a EULA that had been signed by a reporting entity of Bank Negara was admitted into evidence.

Second, the trial court made more than one ruling regarding the admissibility of EULA evidence, and WonderWorks obfuscates our review when it ignores that a series of evidentiary rulings were made at specific times during the trial court proceedings. WonderWorks confuses matters further by placing heavy reliance on a 388-page "offer of proof" that it filed mid-way through trial. On appeal, WonderWorks treats information contained in that document as if it were part of the trial evidence, when it was not.

An October 1, 2018 order, filed sua sponte by the trial court, acknowledges receipt of plaintiff's offer of proof and explains why the court took no action in response to it. This order memorializes facts that inform our review of WonderWorks' claim that EULA evidence was erroneously excluded from the trial evidence. The order recounts that WonderWorks had the opportunity to file an offer of proof *before* the court ruled on every motion relating the EULA, but it consistently failed to do so. Instead, it asked to file an offer of proof after objecting to an in limine ruling, and then waited until after the court made many subsequent rulings before filing. As the trial court found, such a "belated presentation" is inconsistent with the function

14

and purpose of an offer of proof for purposes of appellate review, which is to evaluate a specific ruling based on evidence that was before the court when the ruling was made. (*Nienhouse v. Superior Court* (1996) 42 Cal.App.4th 83, 93–94; *People v. Foss* (2007) 155 Cal.App.4th 113, 126–127.)

Moreover, WonderWorks' offer of proof is based on "legal and logical fallacies," the trial judge found. WonderWorks included new information in its filing that had not been presented when the motions were considered, depriving the defendants of an opportunity to respond. The court also found that the offer misconstrues the court's rulings, and fails to "accurately recount the evidence [WonderWorks had] purportedly been prohibited from introducing." Indeed, concerns about possible erosion of "the judicial process," prompted the trial court to make a record of the fact that it had already "admonished counsel for WonderWorks about their professional and ethical duties," and that it "implore[d] them to be accurate historians for the sake of this trial and the integrity of the judicial system."

Like the trial court, we will guard against any effort to manufacture an overarching error by misconstruing evidentiary rulings relating to the EULA. We limit our discussion to arguments that we can trace to a specific evidentiary ruling, with the caveat that we have no obligation to search the record.[6] As we explain, WonderWorks fails to show error with respect to any specific ruling regarding the admissibility of EULA evidence.

---

[6] The " 'judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.' Plaintiff has the 'burden of overcoming this presumption by showing error on an adequate record.' " (*Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1320–1321.)

### B. The In Limine Order

On September 6, 2018, the trial court granted a pretrial motion by the defense to exclude evidence of alleged contracts precluded by the summary judgment ruling. Several of WonderWorks' appellate arguments implicate this order.

#### 1. Background

Prior to trial, defendants moved for an order precluding WonderWorks from presenting evidence of alleged "side contracts and agreements." Defendants argued this side-contract evidence was irrelevant in light of the summary adjudication finding that the integrated Subcontract between WonderWorks and HP Malaysia is comprised of the three form documents alleged in the complaint.

Moreover, defendants argued that an integration clause in the Subcontract was enforceable under Malaysian law. (Citing *Master Strike Sdn. Bhd. v. Sterling Heights Sdn. Bhd.* (Malay. 2005) 3 MLJ 585.)[7] That clause contains a provision requiring any modification or amendment to the Subcontract to be in a writing stating that it is an amendment to the Subcontract, signed by each party. WonderWorks had no evidence of a binding amendment or modification to the Subcontract, defendants argued.

In their motion, defendants used the EULA as a "prejudicial example" of WonderWorks' intention to "insert unenforceable agreements into this litigation." The Subcontract obligated WonderWorks to provide "multiple licenses of three software programs, at a total price of $220,000." And yet, WonderWorks intended to argue to the jury that HP Malaysia was bound by the EULA and therefore owed $133 million in additional license and maintenance fees. Defendants argued that HP Malaysia, who was not an end

---

[7] References to the MLJ are to the Malayan Law Journal.

user of the software, was not a party to the EULA, and that the Subcontract precluded WonderWorks from imposing its EULA on HP Malaysia.

Opposing this motion, WonderWorks argued that it was entitled to prove that the Subcontract was not its only contract with HP Malaysia, offering three reasons: (1) the complaint alleges the "existence" of other agreements; (2) the summary judgment finding that the Subcontract is the only agreement between WonderWorks and HP Malaysia was dicta; and (3) the Subcontract's integration clause does not apply to agreements outside the scope of the contract. Alternatively, WonderWorks argued that, even if the Subcontract was its only contract with HP Malaysia, evidence of other agreements was admissible to (1) interpret ambiguous terms in the Subcontract pertaining the scope of WonderWorks' work, and (2) prove the quantum meruit claim.

The trial court granted the motion to exclude evidence of alleged side agreements offered to prove the breach of contract claims. The court reasoned that WonderWorks was bound by its pleading, which alleged that WonderWorks and HP Malaysia entered into a single contract with respect to the project (i.e. the Subcontract), and that this integrated agreement was comprised of the Statement of Work, the Global Supply Chain Standard Terms and Conditions, and the purchase orders. WonderWorks could not offer evidence of other alleged agreements to prove a breach of the Subcontract, the court found.

The court rejected WonderWorks' argument that its breach of contract claims embraced agreements other than the tripartite Subcontract. As a preliminary matter, the court found that "Summary Judgment cannot be reversed by a trial judge *in limine*." But even without the summary judgment rulings, the court stated it would have found that "non-original

17

contract evidence" (including the EULA) was inadmissible to prove the contract causes of action, explaining that it based its ruling on its own understanding of the law, the fairest construction of the pleading, and the need to avoid jury confusion.

The court also rejected WonderWorks' alternative contention that the EULA was admissible as parol evidence to resolve a perceived ambiguity in the Subcontract. Allowing in the EULA as evidence of the parties' agreement would contradict the clause in the Subcontract stating it was an integrated agreement, the court concluded. The court also opined that WonderWorks was mischaracterizing the EULA as parol evidence so that it could later use EULA licensing terms to prove the damages element of its breach of contract claims.

However, the court gave credence to plaintiff's theory that EULA evidence could be admissible for some other reason. Specifically, it observed that, because "the *quantum meruit* claim will proceed to trial, . . . the EULA agreement and [related evidence] may be relevant to that cause of action."

### 2. Analysis

WonderWorks contends first that the in limine order is based on a misapplication of the parol evidence rule. We reject this argument, which misconstrues the trial court's ruling. The court found that WonderWorks could not use purported side agreements to prove its breach of contract claims because it was bound by its pleading and the summary judgment order, both of which establish that the Subcontract is a single integrated contract comprised of documents specifically delineated in the complaint.

WonderWorks, not the court, proposed characterizing the EULA as parol evidence. It made a cursory argument that provisions in the Subcontract "about how HP was to pay for WonderWorks' software" were

18

ambiguous, and that the EULA resolved those alleged ambiguities. As noted, the court rejected this argument because relying on the EULA's licensing terms to construe the Subcontract contradicts the express terms of the Subcontract. On appeal, WonderWorks makes the irrelevant argument that the parol evidence rule would not have precluded using the EULA to show that the parties modified the Subcontract at a later date. That distinct issue was not raised in WonderWorks' opposition to the in limine motion, nor addressed in the pretrial order.

Taking a different tack, WonderWorks argues the EULA was admissible as substantive proof of an enforceable contract between WonderWorks and HP Malaysia. This argument appears to rest on three contentions: (1) the complaint states a claim against HP Malaysia for breach of the EULA; (2) the summary judgment court did not preclude WonderWorks from arguing that HP Malaysia agreed to the EULA; and (3) the in limine order depends on an erroneous interpretation of the summary adjudication order. Each prong of this argument is flawed.

First, factual allegations establishing the existence of a contract are found in paragraph 25 of the complaint, which describes the Subcontract that gave rise to this litigation and establishes that the EULA was not part of the Subcontract. The EULA is discussed in paragraph 30, which enumerates the allegations relating to WonderWorks' fraudulent misrepresentation theories. WonderWorks alleged that a representative of the defendants promised that the EULA would be incorporated into the Subcontract and that this representation was false because the EULA was *not* incorporated into the Subcontract, and indeed, "HP never had any intention of" amending the Subcontract to incorporate the EULA. More generally, "HP never had any intention of resolving the commercial disputes with WonderWorks . . . in

compliance with WonderWorks' EULA." These fraud allegations do not state a cause of action for breach of contract, and are squarely inconsistent with WonderWorks' contention on appeal that HP Malaysia agreed to WonderWorks' EULA.

Second, the summary adjudication order contains a finding that the only contract supporting the breach of contract causes of action is the Subcontract between WonderWorks and HP Malaysia. That finding was not dicta; it was based on pleaded facts, the summary judgment evidence, and the failure of WonderWorks to raise a triable issue of fact. While the summary adjudication order did not expressly preclude WonderWorks from arguing that HP Malaysia agreed to the EULA, it did establish definitively that the EULA was neither part of the Subcontract nor an independently enforceable contract between the parties to this lawsuit.

Third, the in limine order was not premised on an erroneous understanding of the summary adjudication order because the trial court stated it would have made the same order regardless of the summary adjudication order. Both the judge who decided the summary judgment motion and the trial judge reached the same conclusion: the complaint states a cause of action for breach of the Subcontract and the EULA was not part of that contract. Because the EULA was not part of the Subcontract, WonderWorks was precluded from offering evidence of that purported side agreement for the purpose of proving a breach of the Subcontract. WonderWorks fails to demonstrate this ruling was error.

WonderWorks also fails to acknowledge that the in limine order expressly contemplated that evidence about the EULA could be admissible for other purposes, such as to prove the quantum meruit claim. This aspect

20

of the ruling reinforces our conclusion that the court did not abuse its discretion in granting the defendants' in limine motion.

## C. The Course of Conduct Motion

On September 14, 2018, WonderWorks called Sri Rajan as its first witness. Rajan, who testified over the course of many days, completed testimony in plaintiff's case-in-chief on October 1. On September 20, the trial court denied WonderWorks' motion for permission to elicit testimony from Rajan regarding the parties' course of conduct as evidence of the meaning of the Subcontract. On appeal, WonderWorks contends that the court's denial of this motion was based on a misapplication of the law of estoppel.

### 1. Background

On September 18, Rajan testified about WonderWorks' EULA. He described it as a warranty-type agreement with customers who purchase WonderWorks software. He testified further that, under the EULA, a software license applies to a "CPU" system, but limits installation of the software to two "cores" within the system. While answering questions about a EULA signed by a reporting entity of Bank Negara that was admitted into evidence, Rajan lamented that other reporting entities did not have the opportunity to license his software because the project was shut down.

On September 18, Rajan also discussed some of the problems between WonderWorks and HP Malaysia that arose before the project was terminated. For example, the Subcontract required WonderWorks to provide six licenses of its "Composer" software for installation on the computer system that was to be constructed for Bank Negara. Rajan testified that HP Malaysia installed more than double that number of copies and never paid WonderWorks for additional licenses.

21

On September 19, WonderWorks filed a "Bench Brief Regarding Evidence of the Parties' Course of Dealing." (Block capitalization omitted.) In that brief, WonderWorks disclosed its intention to elicit testimony from Rajan to explain that when the parties used the term " 'per CPU' " while discussing pricing of software licenses, they meant " 'per core,' " as evidenced by the fact that they agreed to adopt the EULA. WonderWorks characterized this proposed testimony as "course of conduct" evidence, admissible to resolve an ambiguity in the Subcontract's Statement of Work as to what the parties meant when they agreed that software licenses would be priced on a " 'per CPU' " basis. As authority, WonderWorks relied on a Malaysian case applying the principle that when " 'parties to a contract, by their course of dealing, put a particular interpretation on the terms of it . . . they are bound by that interpretation just as if they had written it down as being a variation of the contract.' " (Quoting *Summer Harvest Sdn. Bhd. V. Michael Chang Tze Chon* (Malay. 2017) 5 MLJ 77, 88–89 (*Summer Harvest*).)

On September 20, the court held a hearing and issued a written order denying this motion. It found that testimony WonderWorks sought to elicit from Rajan was not course of conduct evidence; plaintiff did not offer to show how the parties actually used or installed software during the course of their contractual relationship. Instead, the proposed testimony would show only that Rajan thought, guessed or hoped HP Malaysia would adopt Rajan's view that the " 'per-CPU' " licensing term in the Statement of Work was defined in the EULA. WonderWorks could not use this theory to attempt (once again) to incorporate the "independent EULA" into the integrated Subcontract.

The court also found that WonderWorks had misapplied Malaysian law. The court reasoned that the general rule is that " 'an agreement may not be interpreted by reference to the subsequent conduct of the parties

22

thereto.' " (Quoting *Sejati Educ. Sdn. Bhd. v. S3M Dev. Sabah Sdn. Bhd.* (Malay. 2015) 2 MLJ 98, 101.) WonderWorks relied on *Summer Harvest, supra*, 5 MLJ 77, which discusses an exception to this general rule referred to as estoppel by convention. The court further found, to invoke the exception, WonderWorks would have to show (1) the parties' course of dealing put a particular interpretation on the terms of their contract; (2) WonderWorks placed its " 'faith' " on this interpretation and HP Malaysia knew this fact; and (3) it would be " 'altogether unjust' " to allow HP Malaysia to adopt a construction of the parties' contract that is contrary to the parties' prior course of dealings." (Quoting *Summer Harvest*, at pp. 88–89.)

Applying this authority, the court found that the exception WonderWorks asked the court to apply is "limited to situations in which the parties' undisputed conduct establishes 'a particular interpretation on the terms of the contract' such that a party may be estopped from subsequently taking a position contrary to that course of dealing." Wonderworks had not established any of the requirements for applying estoppel by convention to its EULA, the court found. Rather, the only undisputed fact before the court was that there was no enforceable agreement binding HP Malaysia to the EULA. Thus, the EULA was not admissible to vary the terms of the Subcontract under a "course of dealing argument."

### 2. Analysis

WonderWorks contends that the trial court "applied the wrong standard" in denying WonderWorks' estoppel motion. We disagree. Because WonderWorks based its course of conduct motion on the estoppel theory applied in the *Summer Harvest* case, the trial court explained why estoppel by convention did not apply. On appeal, WonderWorks does not discuss *Summer Harvest* at all. Indeed, although it requests judicial notice of

23

multiple other Malaysian court decisions, WonderWorks does not seek judicial notice of the *Summer Harvest* case.[8]

On appeal, WonderWorks attempts to invoke a different estoppel theory. It argues that a party who makes an oral agreement to modify a written contract is estopped from enforcing a term in the contract that requires all contract modifications to be in writing. WonderWorks bases this theory on *Ng Sau Foong v. Rhombus Food & Lifestyle Sdn. Bhd. & Anor* (Malay. 2020) 8 MLJ 155, a case that was decided after entry of judgment in the present case. WonderWorks argues that *Ng Sau Foong* should be applied on appeal because it was simply a clarification of existing law.

Because a determination of foreign law is a question of law, *Ng Sau Foong* could be subject to permissive judicial notice. (Evid. Code, § 452, subd. (f).) However, WonderWorks fails to articulate a valid theory of relevancy, which is a "precondition to the taking of judicial notice in either its mandatory or permissive form." (*Shamrock Foods*, *supra*, 24 Cal.4th at p. 422, fn. 2.) WonderWorks did not rely on the estoppel theory allegedly discussed in *Ng Sau Foong* as a basis for its course of conduct motion. Nor did the trial court deny the motion on the ground that an alleged agreement to follow the EULA was not in writing.

---

[8] WonderWorks has filed two requests for judicial notice, which we grant in part and deny in part. We take judicial notice of Malaysian cases and legal authority that were relied on by the parties in the trial court. Requests for judicial notice of cases that were not presented to the trial court are denied because they are not supported by a showing of relevance. (See *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2 (*Shamrock Foods*).) Nor do we have, as to these cases, substantive "advice of persons learned in the subject matter." (Evid. Code, § 454, subd. (a)(1); see *Mireskandari v. Gallagher* (2020) 59 Cal.App.5th 346, 359.)

In its reply brief, WonderWorks amends its argument to be that *Ng Sau Foong* decided a new point of law by holding that parties can orally vary the terms of a contract that requires modifications to be in writing. For this reason, WonderWorks contends it may rely on *Ng Sau Foong* pursuant to an exception to the rule that a court will not consider a new contention on appeal that applies to a newly decided issue of law. (Citing *In re Marriage of Moschetta* (1994) 25 Cal.App.4th 1218, 1227.) This theory about the significance of *Ng Sau Foong* is not properly raised for the first time in a reply brief. (See e.g. *Owens v. City of Oakland Housing, Residential Rent & Relocation Bd.* (2020) 49 Cal.App.5th 739, 746 (*Owens*).) Regardless, this new legal theory is irrelevant as it has nothing to do with the challenged order excluding course of conduct evidence. WonderWorks' motion was denied because Rajan's proposed testimony was not course of conduct evidence and, even if it could be so construed, WonderWorks failed to satisfy the elements of estoppel by convention. The court did not base its ruling on the Subcontract's requirement that contract modifications had to be in writing.

Finally, WonderWorks contends that the trial court erred by basing its order on the allegedly undisputed fact that the EULA was not a binding agreement with HP Malaysia even though WonderWorks disputed that very fact. Although WonderWorks repeatedly argued that the EULA should be binding on HP Malaysia, the summary adjudication order established that it was not a binding contract, thus we see no error in the trial court's statement. In any event, this assertion was not material to the September 20 order, which denied the course of conduct motion because the proffered testimony was not course of conduct evidence, and WonderWorks failed to establish an estoppel by convention.

## D. Motion to Admit Quantum Meruit Evidence

On September 24, 2018, the trial court denied WonderWorks' motion to elicit testimony about the EULA to prove its quantum meruit claim. WonderWorks disputes this ruling.

### 1. Additional Background

On the morning of September 24, WonderWorks filed a motion to admit evidence of the EULA for a "limited purpose." As its direct examination of Rajan drew near, WonderWorks sought to elicit testimony regarding the EULA and discussions the parties had about it, including a discussion in which HP Malaysia allegedly agreed to the terms of the EULA. WonderWorks argued this evidence was relevant to its quantum meruit claim as proof of "the reasonable value of WonderWorks' software that was provided to HP Malaysia but not paid for."

Opposing the motion, defendants argued that the EULA was not relevant to the quantum meruit claim because that document does not contain any pricing terms and, even if it says something about reasonable value, it pertains to a product, whereas the plaintiff sought quantum meruit relief for unpaid services. Defendants also argued that many terms in the EULA conflict with terms of the Subcontract; alleged discussions about the EULA had nothing to do with licensing terms; and HP Malaysia never agreed to be bound by the EULA.

The trial court denied the motion to admit EULA evidence for purpose of establishing quantum meruit damages, giving three reasons. First, evidence that the parties had discussions about the EULA was not relevant to prove that extra-contractual services were provided, and it appeared to the court that WonderWorks was using this theory as an opportunity to argue that HP Malaysia agreed to the EULA. Second the EULA did not contain

26

relevant information about the value of any product that WonderWorks provided, although the court was open to considering how the terms could be useful for making such a calculation. Third, because the EULA pertains to a software product, it was not relevant to show the reasonable value of services that WonderWorks sought to recover pursuant to its quantum meruit claim.

### 2. Analysis

WonderWorks argues the September 24 order was error because the EULA evidence was relevant to two elements of its quantum meruit claim: (1) to establish that WonderWorks did not intend to provide its software gratuitously, i.e., for free; and (2) to establish the fair value of the software. These arguments assume erroneously that the quantum meruit claim sought compensation for products supplied by WonderWorks.

When the court denied this motion on September 24, the quantum meruit claim alleged in the complaint was limited to a request for compensation for services, and did not encompass goods. The value of a WonderWorks product was not relevant to the quantum meruit claim as it was pleaded at the time this motion was denied, but the court stated expressly that it was open to considering plaintiff's theory as to how the terms of the EULA would be useful in calculating the value of its software. On appeal, WonderWorks fails to show any abuse of discretion in this ruling.

On October 3, after the quantum meruit motion had been denied, the trial court granted WonderWorks leave to amend its quantum meruit cause of action to seek compensation for unpaid goods in addition to unpaid services. As best we can determine, WonderWorks did not file a subsequent motion to admit EULA evidence to prove the amended quantum meruit claim.

27

## II. The Fraudulent Inducement Claim

WonderWorks contends that the trial court committed reversible error midway through trial by excluding "wholesale" WonderWorks' claim that HP Malaysia fraudulently induced WonderWorks to provide goods and services that it was not contractually required to supply. In considering this claim of error, we also consider the largely duplicative argument that the court erred by excluding EULA evidence as proof of fraudulent inducement.

### A. Background

On September 17, 2018, the trial court denied defendants' motion for non-suit of the fraud causes of action. But it also refused to grant WonderWorks permission to present "state of mind" evidence to prove one of its fraud theories–that WonderWorks was fraudulently induced to continue working on the project despite the fact that it was not being paid. WonderWorks had acknowledged during a hearing on the matter that its specific theory was premised on proving a contract breach entitling it to walk away from the Subcontract. Therefore, the court ruled that WonderWorks could not present evidence to show that Rajan relied on allegedly fraudulent inducements and representations (such as an alleged agreement to the terms of the EULA) until it provided evidence establishing that the Subcontract was actually breached.

On September 18, the court heard further argument regarding this fraudulent inducement theory. WonderWorks argued that testimony elicited from Rajan earlier that day proved that HP Malaysia materially breached the Subcontract and opened the door to evidence of fraudulent inducement. Specifically, Rajan testified that, by March 7, 2012, the number of installations of WonderWorks software exceeded the number of licenses provided to Bank Negara under the Subcontract. During argument before

the court, the defendants argued that even if HP Malaysia had a contractual obligation to pay for additional licenses, that obligation was conditioned on issuance of invoices pursuant to the terms of the Subcontract. Defendants also argued that WonderWorks could not have walked away from the project even if a payment was overdue because WonderWorks did not invoke section 9.2 of the Subcontract, which set forth an agreed procedure for terminating the contract. Discussion about the parties' competing theories was protracted, and the court did not rule until the following day.

On September 19, the court made a finding that, as of that date, WonderWorks had not proved a breach of the Subcontract sufficient to open the door to its fraudulent inducement theory. Rajan's testimony about the additional software installations was insufficient because even if HP Malaysia had a contractual obligation to pay for additional installations, WonderWorks had agreed to a "grievance" procedure by executing the Subcontract, and that provision (section 9.2) was enforceable under Malaysian law. Since WonderWorks did not follow the grievance procedure, it was not free to walk away from the project on the ground that additional software installations occurred, the court found. The court stated that its ruling was without prejudice, since additional information or relevant evidence could be forthcoming.

On September 24, WonderWorks filed another motion to elicit testimony about allegedly fraudulent statements by HP Malaysia that induced WonderWorks to continue work on the project despite not being paid. Seeking reconsideration of the September 19 order, WonderWorks argued it was not required to follow the termination/grievance procedure in the Subcontract before it could walk away from the project. According to this

theory, WonderWorks' failure to comply with section 9.2 was "irrelevant" because it had been fraudulently induced not to invoke section 9.2.

The trial court denied WonderWorks' motion for reconsideration. The court found that section 9.2. specifies how to remedy an alleged breach of contract "before anybody has a right to walk away from the contract." Both parties agreed to this provision and plaintiff's theory that the clause simply evaporated once a breach occurred defied logic. The court also affirmed its prior ruling that section 9.2. was enforceable under Malaysian law.

On September 24, the court also addressed a "second part" to WonderWorks' fraudulent inducement argument. That morning, WonderWorks had filed a document titled "Fraudulent Inducement," which presented a new theory. (Block capitalization omitted.) WonderWorks sought permission to admit EULA evidence to prove that it was fraudulently induced to do "other work" on the project that was outside the scope of the Subcontract. The court agreed that WonderWorks had the right to present evidence of fraud, whether or not there was a breach of the Subcontract. But if found that this new theory was flawed because plaintiff wanted to "use [the] EULA" as "their operative agreement" in order to prove fraud as to this other work. In other words, this theory rested on an assumption that HP Malaysia agreed to the EULA, which was not consistent with the evidence. Moreover, WonderWorks had failed to specify what fraudulent statements it was seeking to introduce under this new theory. Thus, the court found that WonderWorks had not met its "burden" under this new theory, but did not make a formal ruling on this request because it was not timely filed, and defendants had no opportunity to respond to it.

On September 27, the court heard further argument on the motions to introduce fraudulent inducement evidence. During the exchange, the court

30

affirmed its prior rulings. It also clarified for the record that it had never ruled that other agreements, such as the EULA, were inadmissible, but only that plaintiff must first "prove[] that Mr. Rajan was able to walk away from the contract." So far, the court found, WonderWorks had failed to produce that proof.

### B. Analysis

Preliminarily, we reject WonderWorks' contention that the trial court made a "wholesale" ruling excluding evidence of allegedly fraudulent inducements. As discussed, the court made a series of rulings, and WonderWorks pursued at least two distinct theories: (1) that WonderWorks was induced to continue performing under the Subcontract; and (2) that WonderWorks was induced to do work outside the scope of the contract. On appeal, WonderWorks fails to present a cogent argument challenging a specific ruling as to either theory.

Initially, WonderWorks focuses on its theory that it was fraudulently induced to do work outside the scope of the contract. It argues that the trial court erred by using section 9.2's termination provision to preclude WonderWorks from offering EULA evidence to prove this theory. It reasons that products and services not covered by the Subcontract were not subject to section 9.2. We reject this argument because WonderWorks misconstrues the record and the trial court's ruling. The request to admit EULA evidence to prove fraudulent inducement to do work outside the contract was denied because this theory was based on the erroneous premise that the EULA was a binding agreement with HP Malaysia, and because WonderWorks had not disclosed in its untimely "Fraudulent Inducement" document what evidence it sought to introduce. We do not find a copy of this document in the Appellant's Appendix or any basis in the appellate briefs for questioning the

31

trial court ruling. (See *WFG National Title Ins. Co v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894 (*WFG National*) ["to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record"].)

Changing targets, WonderWorks next argues that the court erred by using section 9.2 to preclude proof that WonderWorks was fraudulently induced to continue working under the Subcontract, reasoning that the fact that WonderWorks did not invoke section 9.2 is itself evidence that WonderWorks was fraudulently induced. The trial court explained that section 9.2 was enforceable under Malaysian law and rejected the idea that WonderWorks could make this provision "evaporate" by incorporating it into its fraud theory. The court clarified expressly that evidence of side agreements (i.e., the EULA) could be offered to prove this theory once plaintiff substantiated its own premise that when allegedly fraudulent inducements were made WonderWorks was free to walk away from the project due to a contract breach. On appeal, WonderWorks fails to demonstrate any error in the court's ruling.

Finally, WonderWorks contends its motion to admit evidence of fraudulent inducements should have been granted because HP Malaysia was estopped from invoking section 9.2. WonderWorks bases this cursory argument on Malaysia's equitable doctrine of promissory estoppel. According to a declaration by plaintiff's Malaysian law expert that was filed in the trial court, under this doctrine, "a party to a contract can be estopped from insisting on his strict legal rights under the terms of the contract if the said party had made representation of facts, whether fraudulently or otherwise, which were intended to induce the other party to alter his position such that it would be unjust or unfair to permit him to insist on the performance of the

32

original terms of the contract." (Citing, e.g., *Sim Siok Eng v. Government of Malaysia* (Malay. 1978) 1 MLJ 15.)

This estoppel theory might be relevant if HP Malaysia was attempting to pursue its rights under the Subcontract. But WonderWorks turns the doctrine on its head by taking the view that HP Malaysia was estopped from insisting that WonderWorks prove its own theory that it had a contractual right that it did not invoke due to the alleged fraud of the defendants. Trial court rulings that involved section 9.2 were all concerned specifically with WonderWorks' trial theory that it was fraudulently induced to stay on the project, continuing to provide services and software *after* it had no contractual obligation to do so. WonderWorks fails to demonstrate error in the court's decision to hold WonderWorks to its burden of proving a breach that entitled it to walk away before admitting Rajan's testimony about allegedly fraudulent inducements to stay.

## III. The Jury Instruction

WonderWorks contends the trial court erred when instructing the jury regarding the breach of contract claims alleged against HP Malaysia because it gave the following instruction relating to conditions precedent to performance of contractual obligations:

"A condition is an event, the happening of which creates an obligation on the part of the promisor to perform. HP Malaysia and WonderWorks agreed in their contract that HP Malaysia would not have to pay WonderWorks unless WonderWorks submitted invoices in accordance with the payment schedule and financial terms.[9] HP Malaysia asserts the

---

[9] The instruction that was read to the jury prior to deliberations inadvertently identified HP Malaysia rather than WonderWorks as the contracting party that was required to submit invoices. The error was discovered and corrected while the jury was deliberating.

conditions for payment did not occur and that it did not have to pay WonderWorks. To overcome this assertion, WonderWorks must prove that the conditions for payment occurred. . . . If WonderWorks does not prove the conditions occurred for payment, then HP Malaysia was not required to pay it."

WonderWorks argues that a conditions precedent instruction should not have been given in this case because any condition requiring WonderWorks to submit invoices was excused by HP Malaysia's allegedly fraudulent conduct (i.e., concealing allegedly unauthorized software installations and requesting services without formal documentation). This argument, untethered to legal authority, does not constitute a cognizable claim of error.

Parties are "entitled upon request to correct, nonargumentative instructions on every theory of the case" that they advance "which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) On appeal, WonderWorks does not dispute that failure to satisfy a condition precedent was a theory advanced by HP Malaysia, or show that this theory was unsupported by the evidence. Instead, WonderWorks argues it was excused from complying with invoice conditions set forth in the Subcontract.

Assuming the trial evidence supports this theory, it was incumbent on WonderWorks to request an excuse instruction. (See e.g., *Bisno v. Douglas Emmett Realty Fund 1988* (2009) 174 Cal.App.4th 1534, 1555–1556 & fn. 14.) WonderWorks having failed to do so, any error in not giving an excuse instruction is forfeited. When the trial court " ' "gives an instruction correct in law, but the party complains that it is too general, lacks clarity, or is incomplete, he must request the additional or qualifying instruction in order

34

to have the error reviewed." ' " (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1131, italics omitted.)

WonderWorks insists that it preserved its right to appellate review by objecting to this instruction in the trial court. This contention is misleading and ultimately incorrect, as demonstrated by the procedural history of this case that we have gleaned from the record with no assistance from WonderWorks.

On August 31, 2018, the parties filed proposed jury instructions. WonderWorks' breach of contract instructions included a modified version of CACI No. 303, which delineates the essential factual elements of a breach of contract under California law. Wonderworks' version of the instruction omitted— without explanation— elements from the model instruction involving conditions precedent. These elements would have clarified that performance of a condition precedent can be excused. (See 1 CACI No. 303.)

By contrast, HP Malaysia submitted proposed Malaysian law jury instructions, which listed compliance with conditions precedent as an element of each of WonderWorks' breach of contract claims. HP Malaysia also proposed a special conditions-precedent instruction regarding its theory that it was not required to pay invoices for software and services unless "corresponding payment milestones in the contract were satisfied."

On October 1, the parties filed trial briefs regarding proposed jury instructions. WonderWorks did not dispute HP Malaysia's contention that compliance with conditions precedent is a requirement under Malaysian law. However, it objected to the "phrasing of the conditions-precedent element" in HP Malaysia's instructions. It also objected to the proposed special instruction regarding the condition for payment of invoices, arguing that it

was based on an improper construction of the Subcontract and was not a "neutral" statement of the law.

On the morning of October 10, the trial court shared a proposed final version of the instructions with the parties, which included the version of the conditions precedent instruction that was ultimately delivered to the jury. The court crafted the instructions by utilizing the parties' proposed instructions and its own research into Malaysian law. On the evening of October 10, the parties submitted "joint jury instructions," which included "the final instructions written by the Court."

On the morning of October 11, at a hearing to address jury instruction and verdict form issues, the court made a record of its "understanding" that "the parties have adopted the Court's rulings on the Malaysian law, and they have stipulated to all of the instructions as they now stand," with one exception. The exception was an objection by the plaintiff to using the phrase " 'one integrated contract' " in the instructions, which the court overruled. Before the court turned to another matter, plaintiff's counsel stated that WonderWorks maintained its prior briefing objections as to whether the instructions were an "appropriate statement of Malaysian law." Later that day, the court instructed the jury.

On the afternoon of Friday, October 12, the jury began deliberating. At the end of the day, it delivered a note indicating that the conditions precedent instruction may have contained a scrivener's error, in that HP Malaysia's name appeared where WonderWorks' name should have appeared. (See fn. 7, *ante*.) The parties were advised of the note and agreed that the " 'pseudo typographical error' should be corrected." WonderWorks also raised a new objection to the instruction and sought a substantive change.

The following Monday, October 15, the court held a hearing on WonderWorks' request to change the already delivered jury instructions. The court framed the issue as follows: the conditions precedent instruction "was one that was stipulated to by the parties and was sent in to the jurors"; a question from the jury about the wording on one line of the instruction led plaintiff's counsel to have a "new thought" that perhaps the instruction was wrong.

Plaintiff's counsel then argued for the first time that, although a conditions precedent instruction may be reasonable as to the breach of contract claim for unpaid invoices, it did not apply to the claim for unpaid license fees. Counsel reasoned that the instruction essentially directed a verdict for the defense as to unpaid licenses because those licenses were procured without purchase orders, and WonderWorks could not have invoiced the installations without purchase orders. Counsel requested that the court "tailor something different for the unpaid license fees" and revise the special verdict form to reflect that there were no conditions precedent to the contractual obligation to pay for excess licenses.

Defendants opposed these requests, arguing the instruction was substantively correct and plaintiff had agreed to it. Defense counsel also pointed out that the court had permitted plaintiff to amend the quantum meruit claim to seek payment for unpaid license fees, on the theory that those products were not provided pursuant to the Subcontract.

After further argument, the court ruled as follows: "[T]he parties submitted instructions. This section that is being complained of now was not redlined by Plaintiffs. They accepted it. It went to the jurors. Everybody argued their case based upon this. The instruction as it reads presently

37

states the law correctly, and I am going to just change the word 'Hewlett-Packard' to 'WonderWorks,' which is a typographical error."

These procedural facts reinforce our conclusion that WonderWorks has failed to demonstrate error relating to the conditions precedent instruction. WonderWorks stipulated to the instruction that was delivered to the jury. After the jury began deliberations, WonderWorks requested a substantive change to the instruction and verdict forms based on its new theory that the Subcontract's invoice condition should not apply to excessive licenses. Now, on appeal, WonderWorks makes yet another argument—that compliance with this condition was excused, at least with respect to the excessive licenses. Since WonderWorks never requested an instruction regarding its excuse theory, the court did not err by failing to give one. (*Martinez v. Rite Aid Corp.* (2021) 63 Cal.App.5th 958, 972, fn. 4 [appellant "cannot claim error in the failure to give a jury instruction it did not request"].)

In its reply brief, WonderWorks switches targets again by arguing that it was "not legally correct" for the trial court to give the conditions precedent instruction in connection with WonderWorks' other breach of contract claim, the cause of action for unpaid software and services. WonderWorks reasons that its eighth cause of action "was specifically for 'Unpaid Invoices,' " and, therefore the "invoicing condition precedent was not at issue" as to that claim.

First, WonderWorks may not raise this new issue it its reply brief. (*Owens, supra*, 49 Cal.App.5th at p. 746.) Second, this argument was not raised below. Indeed, during the hearing that was held after deliberations began, WonderWorks expressly acknowledged that the conditions-precedent instruction was relevant to its eighth cause of action. Finally, in its reply brief, WonderWorks once again mischaracterizes the record. The eighth

38

cause of action alleged that WonderWorks had complied with all "conditions" of the Subcontract, and HP Malaysia had breached "by failing and refusing to pay Plaintiff for products and services delivered to and accepted by HP, despite repeated requests by Plaintiff for HP to make such payments." This claim sought payment for *all* unpaid products and services for which payment had been requested, not just those that had been invoiced.

## IV. WonderWorks' Agency Theory

Finally, WonderWorks contends the court that granted summary adjudication erred by finding that WonderWorks' agency theory was without merit. That finding was based on evidence before the court when the summary adjudication motions were decided, that the American Entities did not control HP Malaysia "to such a degree that it was merely their agent." On appeal, WonderWorks fails to discuss this evidence or explain how it was insufficient to support the court's ruling. Instead, WonderWorks makes three flawed arguments.

First, WonderWorks contends that it produced evidence in opposition to the summary adjudication motion which showed that HP Co. took over performance of HP Malaysia's " 'day-to-day operations' " on the project. (Quoting *Sonora Diamond Corp.*, *supra*, 83 Cal.App.4th at p. 542, italics in original omitted.) We are not persuaded by this conclusory argument, which is not supported sufficiently by citations to evidence that WonderWorks relied on below. (*WFG National, supra*, 51 Cal.App.5th at p. 894 [appellate court may disregard conclusory arguments not supported by pertinent authority and is not required to "scour the record unguided" by accurate citations].)

For example, WonderWorks contends that HP Co. controlled HP Malaysia during negotiations that resulted in the Prime Contract, citing a declaration by Stephen Illingworth. Illingworth is a former employee of

39

Hewlett-Packard Singapore, who worked in the "HP Software" division from 2007 until December 2010. Illingworth stated that he was "very closely involved with" the Bank Negara project, and that high level executives from many Hewlett-Packard related entities were also involved. He also stated that when HP Malaysia was bidding for the Prime Contract, it had to secure approvals from other Hewlett-Packard entities. But Illingworth resigned from his employment four months before the Prime Contract was executed in April 2011, and his declaration contains no concrete information about HP Malaysia's substantive work on the project.

Similarly, WonderWorks contends that by early 2012, HP Co. took over " 'ultimate decision making authority' " for the project, referring us to the declaration of Andrew Norton, a former contractor of another HP Co. subsidiary. Between October 2011 and October 2012, Norton worked on the project in various "support" roles, and he observed that, as problems mounted, employees of several subsidiaries became involved in the project. Norton specifically recalled the name Kathy Garcia, but was unsure of Garcia's actual employer. Norton shared his "understanding" that Garcia had "ultimate decision-making authority" for the project, since, for example, she approved "project-related travel expenses." Norton's declaration does not support WonderWorks' assertion that HP Co. "took over" the project from HP Malaysia.

WonderWorks' second argument on appeal is that the summary adjudication court committed an error of law because it applied "general" agency principles to conclude that WonderWorks failed to raise a triable issue of fact as to its theory that HP Co. usurped control of HP Malaysia. According to this argument, all WonderWorks had to show was that HP Malaysia was a "special agent" by establishing that HP Co. usurped control of

40

this "one transaction." It did not have to show a total usurpation of control of HP Malaysia " 'as an entity.' "

The complaint alleged HP Malaysia was an alter ego and/or agent of HP Co., without alleging that HP Malaysia was a "special agent" or that there was an agency relationship specific to this transaction. More importantly, WonderWorks opposed summary adjudication on the ground that HP Malaysia was a general agent of its corporate parent, relying on *Sonora Diamond Corp.*, *supra*, 83 Cal.App.4th at page 541, a case it now mischaracterizes as inapposite. The summary judgment court did not commit a legal error by failing to address a principle that was not raised in the pleadings or the summary adjudication motions. Further, even if this new theory could be raised now, WonderWorks fails to substantiate its claim that it produced evidence which showed that HP Co. took over performance of HP Malaysia's day-to-day operations on the project.

Finally, WonderWorks contends that summary adjudication of the agency issue is "especially problematic" because it permits HP Co. to "escape[] liability" despite the jury's special verdict regarding the intentional interference claim, which establishes that HP Co. controlled HP Malaysia and engaged in wrongdoing. Again WonderWorks misstates the record. The jury did not find that HP Co. controlled HP Malaysia nor that HP Co. engaged in wrongdoing. Moreover, the special verdicts have no bearing on our review of the summary adjudication ruling.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents.

41

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.

*WonderWorks Pte. Ltd. v. Hewlett-Packard Company et al.* (A165810)